Court of Common Pleas of Hamilton County.

BIRCH V. STACEY ET AL.

Decided July 10, 1931.

*Paxton & Seasongood,* for plaintiff and intervenors.

*Peck, Shaffer & Williams,* and *Nichols, Morrill, Wood, Marx & Ginter,* for defendants.

MATTHEWS, J.

This cause comes before the court upon the plaintiff's motion for a temporary injunction and the appointment of a receiver.

The plaintiff is a stockholder in the Stacey Manufacturing Company, and predicating his action upon such stock ownership, is seeking in this action equitable relief on behalf of himself and other stockholders and the corporation itself.

From the evidence adduced it appears that the Stacey Manufacturing Company is a corporation under the laws of Ohio, and is conducting a business of manufacturing and selling gas holders, oil tanks and other cast and wrought iron appliances and particularly such as are used by gas and oil companies. The business was started about eighty years ago and has been in continuous existence ever since, during which time it has admittedly built up a valuable good-will throughout the United States, and to a certain extent, in some foreign countries.

The founder of the business was George Stacey and until about 1915 his sons and grandsons were actively engaged in conducting the business, and owned all, or practically all, of the corporate stock; at about that time a disagreement took place among them and James E. Stacey, Andrew J. Stacey and Wayne Stacey, son of James E. Stacey, withdrew from the Stacey Manufacturing Company and organized a competitive corporation, the Stacey Brothers Gas Construction Company, to conduct a similar business, and ever since that time it has been in active competition with the Stacey Manufacturing Company, with its establishment in close proximity. While these gentlemen withdrew from the active management of the Stacey Manufacturing Company at that

time and organized the Stacey Brothers Gas Construction Company to compete with it, they nevertheless continued to own their stock in the Stacey Manufacturing Company, and had a minority representation on its board of directors.

The defendant the Stacey Engineering Company is an Ohio corporation, organized in 1929 by the defendants Wayne Stacey, Andrew J. Stacey and James E. Stacey, and perhaps others, with authority to acquire stock in other manufacturing corporations, including the Stacey Bros. Gas Construction Company and the Stacey Manufacturing Company. Wayne Stacey, Andrew J. Stacey and James E. Stacey transferred to it the stock they owned in the Stacey Manufacturing Company and the Stacey Bros. Gas Construction Company.

The defendant International-Stacey Corporation was organized about two or three months ago, and through purchase of the tangible assets and corporate stock, it owns or controls the International Derrick and Equipment Company, Connersville Blower Company, the P. H. & F. M. Roots Company, the Wilbraham-Green Company and the Stacey Bros. Gas Construction Company.

By virtue of acquiring the corporate stock of the Stacey Engineering Company, which in turn owned stock of the Stacey Bros. Gas Construction Company, which in turn had acquired the stock of Andrew J. Stacey, James E. Stacey and Wayne Stacey in the Stacey Manufacturing Company, the International-Stacey Corporation became the owner of a large proprietary interest in the stock of the Stacey Manufacturing Company.

It is admitted that for many years those in control of the Stacey Bros. Gas Construction Company desired to purchase sufficient stock in the Stacey Manufacturing Company to give the former company control of the latter company, and that desire was one of the prime reasons for organizing the Stacey Engineering Company, and when International-Stacey Corporation came into existence, those in control of that corporation did all they could to bring to a conclusion the plan of acquiring a controlling interest in the Stacey Manufacturing Company.

At the time of the annual meeting of the stockholders of the Stacey Manufacturing Company on April 13, 1931, the stock of that company was so distributed that the control depended upon the attitude of Maud Sutton. If she allied herself with those stockholders of Stacey Manufacturing Company who were interested in International-Stacey Corporation, they would have a majority; and if she allied herself with those stockholders of the Stacey Manufacturing Company who were not stockholders in International-Stacey Corporation or its subsidiaries, they would have the majority. At that annual meeting Maud Sutton, Wayne Stacey, Andrew J. Stacey, Edward Baechle and Alvin A. Ranshaw were elected directors. The issue of control was not squarely met.

It is a fair inference from the evidence that the defendants Carmi A. Thompson and Wayne Stacey, representing International-Stacey Corporation, some time prior to April 13, 1931, had concluded to purchase on behalf of International-Stacey Corporation all the stock of the Stacey Manufacturing Company not then owned by International-Stacey Corporation. The court draws that inference from the evidence, that they attended the stockholders' meeting of the Stacey Manufacturing Company on that date, and the defendant Carmi A. Thompson negotiated with Maud Sutton for the purchase of her stock and announced in substance that all stockholders of the Stacey Manufacturing Company would be treated alike, and that if he purchased Maud Sutton's stock, he would buy the stock of all the other stockholders at the same price per share. He continued his negotiations with Maud Sutton and finally reached an agreement with her to pay $125 per share, one-third payable in cash and the balance payable in installments. She then resigned as director and at a meeting of the board of directors held on the 8th day of May, 1931, the defendant Carmi A. Thompson was elected to fill the vacancy.

Among the assets of the Stacey Manufacturing Company were fifty thousand ($50,000) dollars in Liberty bonds, call loans, stocks and other bonds, cash totaling one hundred and thirty-five thousand ($135,000) dollars, accounts and notes receivable totaling over three hundred and eighty thousand ($380,000) dollars, on Decem-

ber 31, 1930. Whether all of those items were properly denominated as "quick assets" it is not necessary to determine, but there is no doubt but what substantially all of it was readily convertible into cash.

The court does not deem it necessary to determine definitely what portion of these "quick assets" were absolutely needed for the successful prosecution of the business of the Stacey Manufacturing Company in its normal operation as an autonomous corporation. Certainly this additional capital enhanced its ability to compete with rivals.

It is a fair inference from the evidence that the defendants Carmi A. Thompson and Wayne Stacey and their associates reached the conclusion that under their plan a large part of the "quick assets" of the Stacey Manufacturing Company were not needed in its business, and that by converting those assets into cash and distributing the cash among the stockholders of the Stacey Manufacturing Company the value of the stock in the Stacey Manufacturing Company would be proportionately reduced, and in that way the amount of money which they would be required to use in the purchase of such stock would be likewise reduced. The dividend on the stock already owned by them and their associates could be used in financing the purchase. They concluded, therefore, to convert a part of these "quick assets" into money and distribute the proceeds among the stockholders in pursuance of that determination. At a meeting of the board of directors held on the 13th day of May, 1931, at which all of the directors were present, a resolution was unanimously passed reciting that the "quick assets" of the company amounted to at least $312,372.69, and that this entire amount was unnecessary in the business of the company as the same was conducted at that time or would be conducted in the future, and it was resolved that sufficient of these "quick assets" of the company should be disposed of to realize $185,000, and that that amount should be paid to the stockholders of record on the books of the company on May 14, 1931. The resolution also contained the recital that that sum should be distributed among the stockholders in the amount of $25 per share; that the officers of the company were authorized to sell

the "quick assets" necessary to carry the resolution into effect. Within a few days thereafter Liberty bonds and other securities were sold, and on May 18, 1931, letters were transmitted to all the stockholders notifying them of the action taken and enclosing checks in accordance with the resolution. Thus $185,000 was removed from the working capital of the Stacey Manufacturing Company and more than half of it went to increase the capital of International-Stacey Corporation.

Previous to this, to-wit, May 12, 1931, the defendant Wayne Stacey caused a letter to be prepared on the letterhead of the Stacey Bros. Gas Construction Company, signed by it, per himself, addressed to stockholders of the Stacey Manufacturing Company, informing them that the Stacey Bros. Gas Construction Company had purchased the majority of the stock of the Stacey Manufacturing Company; that following the request of the recent owners of such stock, the Stacey Bros. Gas Construction Company offered to purchase the stock of the Stacey Manufacturing Company and pay therefor $25 in cash and five (5) shares of the Class A stock of International-Stacey Corporation, with the provision that in case of the distribution after May 12, 1931, by the Stacey Manufacturing Company from its assets to its stockholders, the cash distribution per share should be deducted from the price offered. No substantial protest was made by any stockholder or officer of the Stacey Manufacturing Company against the distribution of $25 per share prior to the sending of the letter enclosing the distribution checks.

Immediately thereafter, and upon consideration of the offer made by the Stacey Bros. Gas Construction Company, various stockholders of the Stacey Manufacturing Company protested. On May 22, 1931, the directors Ranshaw and Baechle placed their protest in writing in the form of a letter to Ranshaw, who was president of the Stacey Manufacturing Company. This letter was placed in the files of the company and read by Ranshaw over the telephone to defendant Thompson.

The evidence shows that after the distribution letter and the letter from the Stacey Bros. Gas Construction Company, offering to purchase their stock were received by the stockholders of the Stacey Manufacturing Com-

pany, they consulted attorneys, and were advised that the distribution impaired the capital of the Stacey Manufacturing Company, and that therefore the board of directors had no authority to make it, and that such distribution could only be made upon the authorization of two-thirds of the stockholders at a meeting of stockholders called for that purpose.

Counsel representing plaintiff and other stockholders sent a letter to the directors of the Stacey Manufacturing Company on May 22, 1931, in which they demanded that all action taken at the meeting of May 13, 1931, be rescinded and set aside, the company be restored to the same position as if such action and proceedings had not taken place, and that a meeting of the board of directors be forthwith called to rescind such action and to authorize proceedings to recover the money distributed.

A meeting of the board of directors was held on May 27, 1931, at which the resolution authorizing the distribution was rescinded and a resolution was passed directing the secretary to call upon the shareholders of the company for a return of the funds distributed, and notice of this action by the board of directors was mailed to the stockholders on the same day. The protesting stockholders have refused or returned the dividend, but International-Stacey Corporation and those affiliated with it have received and retained it.

On the request of three stockholders, to-wit, Wayne Stacey, Carmi A. Thompson and Andrew J. Stacey, a special meeting of the stockholders of the Stacey Manufacturing Company was called to be held on Monday, June 29, 1931, to consider the subject of reducing the capital stock by $25 per share and suggesting alternate ways in which that result could be accomplished.

After the protest made by the stockholders against the distribution and the rejection of the offer to buy the stock by the Stacey Bros. Gas Construction Company, the defendant Thompson initiated negotiations with counsel for the plaintiff for the purchase of the stock and eventually tentatively agreed, subject to confirmation by his board of directors, to pay $125 per share, of which approximately $40 was to be in cash, and the balance payable over a period of two years with deferred pay-

ments to be secured by a mortgage on the assets. The terms of this offer were substantially the same as those in the contract with Maud Sutton, excepting as to the time of payment and the security. The board of directors of International-Stacey Corporation rejected the proposal.

Immediately upon the acquisition of the Maud Sutton stock the defendants Wayne Stacey and Carmi A. Thompson and those affiliated with them, seem to have assumed that the so-called merger was a fact accomplished and proceeded to execute their plan to merge the business and organization of the Stacey Manufacturing Company with the business and organization of International-Stacey Corporation. A separate telephone of the Stacey Manufacturing Company was ordered to be removed, and a branch line substituted therefor connecting the Stacey Manufacturing Company office with the private exchange in the Stacey Bros. Gas Construction Company's office; plans for the removal of the executive offices from the Stacey Manufacturing Company to the office of the Stacey Bros. Gas Construction Company were formulated; plans for shifting the officers of the Stacey Manufacturing Company to positions in the organization of International-Stacey Corporation, and officers of International-Stacey Corporation into position of the Stacey Manufacturing Company were discussed and matured. The separate and distinct advertising on behalf of the Stacey Manufacturing Company was ordered discontinued, and letters were sent out in which it was recited that a merger had taken place, and it was also planned to transfer machinery from the plant of the Stacey Bros. Gas Construction Company to the plant of the Stacey Manufacturing Company, and in turn to transfer certain machinery from the latter company to the former, all for the purpose of greater efficiency in the operation of the aggregate business of International-Stacey Corporation. There was printed on the door of International-Stacey Corporation in New York City the legend that it was the successor to the Stacey Manufacturing Company and maintained there up until the time their action was filed on behalf of dissenting stockholders.

International-Stacey Corporation arranged to finance

its operations by an issue of debentures aggregating $1,-500,000 under a "Trust Debenture," in which it was recited that the Stacey Manufacturing Company was a subsidiary and that International-Stacey Corporation "will not create or assume, *nor permit any subsidiary to create or assume, any obligations,* secured or unsecured, maturing later than one year from such creation or assumption, which would have a claim prior or equal to that of the debentures issued hereunder on any assets or earnings of the company or of any of its subsidiaries."

The "Trust Debenture" contained many other restrictions upon the independent action of the "Subsidiaries" and an assumption of the power to control them on the part of International-Stacey Corporation. While the affairs of the "Subsidiaries" were regulated by this agreement they were not included in the contracting parties.

It is apparent from the acts of the officers of International-Stacey Corporation that it was their purpose to completely submerge the Stacey Manufacturing Company as a separate corporate entity, and make it the mere agent or instrumentality or subsidiary of International-Stacey Corporation, and conduct its business as a unit or department of International-Stacey Corporation, or to entirely abandon its operation if the symmetry of the larger plan made it desirable to do so.

It is quite clear that the plan was to disregard the authority of the board of directors of the Stacey Manufacturing Company and have its business and affairs ordered and directed by the officers of International-Stacey Corporation. Although three of the directors of the Stacey Manufacturing Company qualified with stock actually owned by International-Stacey Corporation and were elected to carry out its purpose, it would seem from their action that they had not intended a control through formal action by the board of directors of the Stacey Manufacturing Company.

During the short period between the acquisition of the Maud Sutton stock and the dissent by stockholders that direct control of the Stacey Manufacturing Company by the officers of International-Stacey Corporation was in fact exercised directly.

As the court has already said, these things were done

by International-Stacey Corporation and its officers on the assumption that a so-called merger had been effected. As soon as the dissent was made, all such action was discontinued and in certain instances what had been done was rescinded. Notwithstanding the fact that these things were done on the assumption of a so-called merger being accomplished by unanimous consent, and the further fact that when the mistake was discovered they were discontinued, they show the purpose and intent of International-Stacey Corporation and its officers, and that intent was and is to disregard the autonomy of the Stacey Manufacturing Company as a separate corporation under obligation to conduct its business exclusively for the benefit of its own stockholders and to make it a mere agent or instrumentality of International-Stacey Corporation carrying on activities under the domination of officers of International-Stacey Corporation in furtherance of the aggregate business and profits of International-Stacey Corporation, and that its business and profits be the controlling consideration and without regard to whether the separate business of the Stacey Manufacturing Company be enhanced or reduced thereby.

The legal question presented by this situation is whether or not one corporation, through its control of a majority of the board of directors of another corporation, can thus dominate, control and absorb that other corporation over the protest of minority stockholders thereof.

It is objected by the defendants that this is an action the sole object of which is to secure the appointment of a receiver. If that were true, there would be no question but what the action could not be maintained. Chancery never appointed a receiver excepting as an ancillary remedy in an action to protect rights by some other ultimate equitable remedy, and as the case at bar is an action appealing to the general equitable jurisdiction of the court, it must be measured by that standard.

In the recent case of *Hoiles* v. *Watkins et al.,* 117 Ohio St., 165, the Supreme Court reiterates the equitable rule, and held, as stated in the first paragraph of the syllabus, that:

"The appointment of a receiver is an extraordinary provisional remedy of ancillary character, regulated by

statutory provision, and allowable only in cases pending for some other purpose."

It should be observed again that this action is now before the court not only for the appointment of a receiver, but also for the issuance of a temporary restraining order. The prayer of the petition is in the standard form for a temporary restraining order, and that upon final hearing the restraining order be made perpetual.

Plaintiff prays that the defendants be enjoined from holding the meeting of directors and stockholders that was called to be held June 29, 1931; from voting any shares at stockholders' meeting in favor of reduction of the capital stock of the Stacey Manufacturing Company; from in any way impairing the capital, assets, good will and business of that company; from using their position as majority stockholders and directors in opposition to the best interests of the Stacey Manufacturing Company, or in aid of International-Stacey Corporation, or its constituents; from serving on the board of directors of the Stacey Manufacturing Company; from proceeding further to acquire the stock of Maud Sutton and those associated with her, and the stock of the estate of J. Frank Stacey; that Carmi A. Thompson, Wayne Stacey and Andrew J. Stacey be enjoined from doing any acts, either as directors or stockholders, to the injury of the business of the Stacey Manufacturing Company; that they be held personally liable in the sum of $500,000, or to the amount of the damage caused by them to the Stacey Manufacturing Company; that they be required to cancel any contracts or purchase of stock of the Stacey Manufacturing Company, and that that company be decreed to have a lien on the stock of all such defendants as have not repaid the distribution made by the directors of the capital of said company.

It is apparent from this recital that the plaintiff seeks equitable relief other than the appointment of a receiver. Plaintiff prays that a receiver be appointed for the business and assets of the Stacey Manufacturing Company, either to operate the same or to sell the same with the good will of the company, as the court may direct.

The case, therefore, being one in which ultimate equitable relief is sought other than the appointment of a re-

ceiver, it is necessary to determine whether or not the evidence discloses a case for either a temporary restraining order or the appointment of a receiver, or both, pending the final hearing of the case.

The defendants object to the granting of any relief on the ground that the law vests in the stockholders and directors the control of the corporation, and that equity cannot enjoin the exercise of legal rights, unless it appears that a fraud will be perpetrated upon others, who in this case are the minority stockholders. It is, of course, conceded readily that the law does vest in the stockholders and directors the authority to control the corporation, and in the absence of that which is sometimes characterized as fraud, a court of equity will not interfere with the exercise of that authority. Conceding these things, however, does not advance the inquiry. The question still remains as to whether or not the evidence discloses a situation of the imminence of acts on the part of the majority actuated by motives not sanctioned by the law, that will probably result in injury or damage to the rights of the minority.

We have seen what the majority has done at a time when it was supposed that there was no dissenting stockholder. We have seen that that action was pursuant to the plan formulated by those who had been for years and were then in active competition with the Stacey Manufacturing Company. Those same antagonistic interests are still in active control of the majority stock and constitute a majority of the board of directors of the Stacey Manufacturing Company. It is true that they have rescinded, in some respects but not in several important respects, their actions taken prior to the protest of the minority and profess an intent to hereafter treat the Stacey Manufacturing Company as an independent corporation. It should be remembered also in this connection that these defendants owe an allegiance to International-Stacey Corporation and its constituents, that are naturally and inevitably competitors of the Stacey Manufacturing Company, and that to think and act singly and solely in the interests of the Stacey Manufacturing Company forces them into another disloyalty. It is for that reason that it is an impossibility for their conduct as directors of the

Stacey Manufacturing Company to meet the requirements of the law. Their motives will not stand a legal analysis.

Counsel for the defendants cite the case of *Hoiles* v. *Watkins, supra,* as an authority for the proposition that the mere fact that the majority stock of two competing corporations is owned by the same individual or group of individuals is no ground for the appointment of a receiver to preserve the assets of either corporation, or the issuance of an injunction against the exercise of the rights of stock ownership. That may be conceded, but whether or not the majority is illegally and wrongfully, and from motives other than that of promoting the interests of the particular corporation, exercising the rights and powers of control, is a question of fact in each particular case. In the case cited the only fact proven was the ownership of the majority of stock by the same individual in two competing newspapers, who was also a creditor, and there also appeared in that case a tender and offer by that majority stockholder:

"to extend the time of payment of his note against the Journal for a period of one year; that he consented and agreed to trustee his stock in the Journal for the same period of time to a trustee appointed by the court, with full power in that trustee to vote at any of the regular or called meetings of the board of directors of the company, with one limitation, that the trustee was not to vote for a change of the corporate character of the company or a sale of the assets of the company."

The court on the subject says at page 179:

"In the light of the evidence and the offer of the defendant Hoiles with reference to the relinquishment of his right of control under his stock, or of his rights to reduce his promissory note to judgment and resultant levy, we think there was no sufficient showing of facts, or acts, going to make up actual or constructive fraud, to justify this appointment."

Quite a different situation is presented by the evidence in the case at bar. The defendants have made an illegal or irregular distribution of the capital of the Stacey Manufacturing Company and thereby reduced its power as a competitor and enhanced the power of the defendants. This act was done in pursuance of a plan to gain control

of the corporation and they have not responded to their own demand that the money improperly distributed be restored. They have not abandoned their plan of financing by "Trust debentures" the provision of which assume to encumber the assets and limit the independent action of The Stacey Manufacturing Co. without any action by it as a corporation. They have, in other ways not necessary to repeat, already indicated their original intent to completely dominate the Stacey Manufacturing Company and control its affairs directly and subordinate its business and interests to the business and interests of International-Stacey Corporation, and they have placed, and there is now on the board of directors of the Stacey Manufacturing Company a majority who are actively engaged at the same time in direct competition with the Stacey Manufacturing Company, and owing allegiance to those in direct competition. There was no such situation in the case of *Hoiles* v. *Watkins, supra.*

In the annotation to the case of *Greer* v. *Stannard,* 64 A. L. R., 772, at 784, the authorities are collected on the subject of the right of stockholders, directors, officers and agents of a corporation to engage in a similar or competing business, and the annotator deduces from the authorities that they have that right

"provided that in doing so they act in good faith and do not interfere with the business enjoyed by the corporation."

The same rule is stated in Thompson on Corporations, 3d Edition, Section 1350. The same author in Section 1347 discusses the question of dealings between two corporations having the same directors, and he states that the more general, as well as the more reasonable rule is that such contracts are not void, but voidable, and that their fairness must be shown by clear and convincing proof.

In the case at bar, therefore, we have a situation in which two competing corporations are so controlled that every act would be subject to the strictest scrutiny and the one dominated by a board of directors that has already manifested its purpose to merge the business of one with the other and to give control to that other, which

board almost inevitably must sacrifice its interests to that of the other corporation.

A statement of the equitable principles applicable could be taken indiscriminately from the briefs of either counsel. A great array of adjudicated cases could be cited and quoted from in support of these principles. The fundamental principles cannot be in serious dispute. Doubt only arises when the attempt is made to apply them to the facts of the specific case. It is conceded that the directors and officers of a corporation occupy a fiduciary relation to the corporation and to the stockholders. It is suggested among stockholders themselves there is no such fiduciary relation. That is true, with this qualification, that when stockholders are directly controlling corporate action they occupy the same fiduciary relation to the corporation and the other stockholders as the directors occupy when they act for and on behalf of the corporation.

In the case of *Cavanaugh* v. *Cavanaugh Knitting Co.*, 126 N. Y. Supp., 185, a minority stockholder sought to enjoin the dissolution of a corporation by the majority stockholders on the ground that the majority had not acted in good faith in adopting the resolution to dissolve, and the court in holding that if such bad faith could be proven the dissolution would be enjoined, said at page 195:

"When a number of stockholders constitute themselves, or are by the law constituted the managers of corporate affairs or interests they stand in much the same attitude toward the other or minority stockholders that the directors sustain, generally, toward all the stockholders and the law requires of them the utmost good faith, (*Farmers Loan & Trust Company* v. *New York & Northern Railway*, 150 N. Y. 410, 430; *White* v. *Kincaid*, 149 N. C., 415; *Ervin* v. *Oregon. Ry. & Nav. Co.*, 27 Fed. Rep. 625). In taking corporate action under the statute, the stockholders are acting for the corporation and for each other, and they cannot use their corporate power in bad faith or for their individual advantage or purpose."

Quotation from a few authorities will be made to indicate the class in which, in the opinion of the court, the actions of the directors and stockholders, as shown by the evidence place this case.

The case of *Jacobs* v. *Diamond Soda Water Manufacturing Company, et al,* 88 N. Y. Supp. 302, was one in which it appeared that the corporation manufactured and leased a machine invented by one Malmstrom and assigned by him to it. One Mulholland, apparently knowing that Malmstrom had invented another machine to which the corporation might be entitled, concluded to and did purchase a majority of the capital stock of the corporation, and then organized a new corporation for conducting a similar business, and through resignation and filling of vacancies, he came into control of the board of directors of both corporation. Thereupon the board of directors of the Diamond Company authorized the leasing of its shop and premises to the new company, and shortly thereafter the new company established its place of business at the office and factory of the Diamond Company and assumed entire charge of its property and affairs. There was an additional element in the transaction, which is sufficiently stated in the syllabus as follows:

"Where a corporation was indebted to its directors, and they caused bonds to be issued to them for such indebtedness, secured by mortgage on the corporation's property, but the issuance of the bonds, etc. was in bad faith, in order that they might be assigned to another, who had organized a rival company, the court in an action under the statute would have been justified in canceling the bonds and mortgage."

In holding that the plaintiff was entitled to relief, the court described the transfer of the entire authority to another corporation in this language, at page 313:

"They are, however, proper parties to the action and although, so far as appears, they may have acted innocently, the minority stockholders, neither having assented to the arrangement nor done anything to estop them from demanding an accounting for mismanagement, are entitled to such accounting even against the director who may have acted in good faith, for the reason that it is manifest that it was not a mere temporary arrangement, such as it was intimated in *Denike* v. *N. Y. & R. Lime & Cement Co.,* 80 N. Y. 599, 606, might be legal, *but one by which the entire property, including the good will of the Diamond Company, was turned over to the mangement of a rival company, without any restrictions or*

*limitations for the protection of the stockholders. The
arrangement was clearly ultra vires (People v. Ballard,
supra), and a considerable fraud upon the stockholders
of the Diamond Company. The Diamond Company vir-
tually suspended the functions for which it was incor-
porated, and of this any of the stockholders who were not
parties to the arrangements, or the state, might complain,
and demand a restoration."*

In the case of the *Columbia National Sand Dredging
Company* v. *Washed Bar Sand Dredging Co., et al*, 136
Fed. 710, it appeared that the plaintiff corporation was
the owner of the patent for a sand dredging machine and
had entered into an agreement with Miller and Patter-
son, whereby they agreed to organize a corporation to
operate in the Delaware River in dredging for sand, and
that a machine for that purpose should be built, for
which the plaintiff agreed to give the proposed corporation
a perpetual license in consideration of one-fourth of the
capital stock of the proposed corporation, which was to
be $25,000. etc. The corporation was organized and pro-
ceeded to build the machine at the expenses of Patterson,
in accordance with the agreement. After a certain time
the corporation was controlled and conducted alone by
Patterson at the office of another corporation, and to which
the defendant corporation paid an annual fee of $1,700 to
manage and conduct its affairs. There was no manage-
ment on the part of the board of directors of the defend-
ant corporation, its affairs being managed as though
they were owned personally by Patterson. The Plaintiff
sought the appointment of a receiver, and in granting the
relief sought, the court, at page 712, said:

"Courts will not take the property of a corporation out
of the possession of its owners at the suit of a minority
stockholder, without there is a very grave necessity there-
for; but where the facts recited in a bill charging mis-
management show that the board of directors who are
responsible for the mismanagement are the majority
stockholders, and that they are managing the corporation
for their own benefit, and diverting its funds and income
to themselves, the minority stockholders, or any of them,
would be entitled to relief, either by injunction, where
that remedy could correct the evil, or if necessary, the
appointment of a receiver, and the majority stockholders
who violated their trust would have no just cause for

complaint. A receiver will be appointed where the majority stockholders are clearly violating the chartered rights of the minority and putting their interest in imminet danger, or where the holders of the majority of the stock neglect to elect officers."

In the case of *Green* v. *National Advertising & Amusement Co.*, L.R.A., (N.S.) 1917 E., at 784, the Supreme Court of Minnesota held, as stated in the first paragraph of the syllabus, as follows:

"The officers of a corporation are charged in the performance of their duties with certain obligations of trust and confidence to all the stockholders thereof without discrimination, to be performed with fidelity, and any intentional deviation or departure therefrom to the substantial injury of any of the stockholders constitutes wilful mismanagement as a matter of law, for which a court of equity has jurisdiction to call them to account."

In *Thompson on Corporations*, Vol. 6, at page 407, the author says:

"Even a defrauded corporation may compel the corporation perpetrating the fraud through its president, who was also general manager of such defrauded corporation, to account for any advantage obtained by reason of the fraud. So where officers and directors sold all the property of their corporation at an inadequate price to another corporation of which they were the officers and directors, a stockholder was held to have the right to cause the sale to be set aside. Where, as said by the New York Court of Appeals, 'a majority of the stock is owned by a corporation or combination of individuals and it assumes the control of another company's business and affairs through its control of the officers and directors of the corporation, it would seem that for all practical purposes it becomes the corporation of which it holds a majority of stock, and assumes the same trust relation toward the minority stockholders that a corporation itself usually bears to its stockholders'."

The same author in Section 6296 says upon the subject of the appointment of a receiver that;

"A receiver may be appointed where there is such dissension among the members of the governing body as prevents the affairs being carried on properly * * * So it has been held proper to appoint in a case where two or three persons owning the corporate stock combined

against the third and. excluding him from his rights as a stockholder and officer."

In *Tompkins Co.* v. *Catawba Mills,* 82 Fed. 780, the Court said:

"It is not denied that in the board of directors and in the administration there. is a deep seated division. not to be healed. This makes a receiver imperatively necessary."

The law of Ohio is in full accord with the uniform rule elsewhere, as is shown by the case of *Thomas* v. *Matthews,* 94 O. S., 32, and *Briggs* v. *Grocery Co.,* 116 O. S., 343. In the former case the court held that a director of a corporation could not lawfully limit or restrict by contract the free, exercise of his judgment. or discretion as director, and that a contract. that by its express terms purported to do so, or that placed him under contract and powerful inducements to disregard · his duties to the corporation and its stockholders, is against public policy and void; and in the latter case the court held that a resolution fixing salaries of officers passed by the votes of directors whose salaries were fixed was illegal and that no action by the officers for the salaries could be maintained.

The fundamental defect in the proceedings in this case is that it is an attempt to consolidate corporations without complying with the terms of the statute. Section 8623-67, General Code, provides for the method of consolidating corporations, the basis of which is an agreement between the corporations approved by their respective boards of directors, and ratified at a special meeting of all the shareholders by the votes of two-thirds of the voting power, with the reservation, however, imposed by Section 8623-72, that any dissenting stockholder shall be entitled to receive the fair cash value of his shares as of the day before the vote was taken authorizing the consolidation, and in the event of a failure to agree upon such value, either the corporation or the dissenting stockholder has the right within six months thereafter to petition the court of Common Pleas of the county to. determine the fair cash value.

The merger was originally predicated on the assumption of unanimous consent. No definite commitment should have been made till unanimity was assured, and

when it was discovered that there were dissenting stockholders, the merger or consolidation should have been abandoned or it should have been proceeded with in accordance with the statute. If it had been, no just complaint could have been made by the dissenting stockholders, because the statute gives them a remedy for obtaining the entire value of their interest in the corporation. To permit the defendants to proceed would accomplish their purpose of merging these corporations for all substantial purposes and deprive the minority stockholders of the remedy provided by the statute in such cases.

It has been suggested that the fact that the plaintiff is willing to sell his stock shows an ulterior motive and prevents the maintenance of this action. The court does not look upon that as an improper motive. Of course, this action is to protect property rights. If the defendants should purchase the plaintiff's stock, that would be giving to him no more than the right of a dissenting stockholder in case of a consolidation. He has a legal right to resort to the court for the protection of his property and he has a legal right to sell his property. He is as free to exercise one as the other.

The court has reached the conclusion that the plaintiff has established his right to such preliminary orders of the court as will preserve the *status quo* pending the final determination of this action. This includes an order restraining the defendants, who are directors of the Stacey Manufacturing Company, and also officers and directors of International-Stacey Corporation or its subsidiaries, from acting as directors of The Stacey Manufacturing Company, also restraining them and the defendant corporations from voting stock at the stockholders' meeting for the reduction of the capital stock of the Stacey Manufacturing Company and from in any way incumbering such stock, and inasmuch as there is no lawfully constituted board of directors entitled to act for and on behalf of the corporation, a receiver will be appointed to take charge of and manage its affairs until the final hearing of this cause or the further order of this court.

Orders may be prepared accordingly.